**LOCAL 9, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Plaintiff-Appellee,**

v.

**SIEGRIST CONSTRUCTION CO., a Colorado corporation, Defendant-Appellant.**

**No. 71–1443.**

United States Court of Appeals, Tenth Circuit.

May 5, 1972.

William E. Myrick, Denver, Colo. (Robert O. Newton, Denver, Colo., with him on the brief), for plaintiff-appellee.

Maurice Reuler, Denver, Colo., for defendant-appellant.

Before PICKETT, HILL and DOYLE, Circuit Judges.

PICKETT, Circuit Judge.

This suit was instituted by Local 9, International Union of Operating Engineers, AFL–CIO against Siegrist Construction Company to enforce a collective bargaining agreement providing for the payment of fringe benefits. Jurisdiction is based on 29 U.S.C. § 185, the Labor Management Relations Act.

The facts are undisputed. Plaintiff union is composed of operators of heavy equipment in the construction industry and defendant is a construction company engaged in general engineering and construction, primarily contracting with federal and state agencies and governments. In 1966 the union concluded a collective bargaining agreement, called the Master Agreement for the State of Colorado, concerning wages and other conditions of employment with various construction companies, including Siegrist. Contemporaneously with this Master Agreement and incorporated therein by reference, the union and these construction companies, including Siegrist, entered into a Health, Welfare and Pension Agreement which provided that the companies would make payments of a specified amount per hour per employee into the Health, Welfare and Pension Trust Funds which were established for the benefit of union members. These payments are generally referred to in the area of labor relations as fringe benefits.

The Master Agreement, which was to expire March 1, 1969, was for a period of three years. By its terms the Health, Welfare and Pension Agreement provided that it was not to expire prior to April 30, 1971. Siegrist made these benefit payments until March 1, 1969, the date upon which the 1966 Master Agreement expired. The company, however, refused to make additional payments into the trust funds thereafter, contending that insomuch as it had not entered into a subsequent master agreement, its obligation to make payments under the Health, Welfare and Pension Agreement was terminated. The union maintains, on the other hand, that the unequivocal provisions of the Health, Welfare and Pension Agreement obligated Siegrist to make these payments into the fund for the remaining two years regardless of whether or not it was a party to a new master agreement.

The sole purpose of this action is to collect the amount due under the second contract for the period March 1, 1969 to March 1, 1971.[1] The trial court rejected Siegrist's contentions, holding that the contract was unambiguous, and requiring Siegrist to account for the amount due.[2]

The Health, Welfare and Pension Agreement provides, in part:

OPERATING ENGINEERS COLORADO HEALTH AND WELFARE AND PENSION AGREEMENT 1966–1971

WHEREAS the parties have contemporaneously entered into an Oper-

---

1. Although the agreement specified payments up to April 30, 1971, the parties stipulated during proceedings in the trial court to the date of March 1, 1971.

2. In this connection, the court stated:
"We can find nothing ambiguous about the duration language in this agreement. In five separate places 1971 is mentioned as the earliest possible year of termination and the rates of payment are enumerated for the period March 1, 1968, to March 1, 1970. The introduc-

tory clause of the agreement even expresses the intent of the parties that the pension agreement outlive the master agreement by more than two years. * * * Even the master agreement, which incorporates the pension plan, states in Article XXIII that '[e]xcept as herein otherwise provided,' the agreement expires on March 1, 1969. Given this plain, indeed obvious, language, we must reject defendant's contention that the agreement is ambiguous * * *."

ating Engineers Colorado Building, Highway, Heavy and Engineering Agreement dated May 31, 1966, and

WHEREAS said collective bargaining agreement by its terms may expire on Midnight, April 30, 1969, and

WHEREAS with respect to Health and Welfare and Pensions the parties desire a settlement and collective bargaining agreement covering Health and Welfare and Pensions which, by its terms, may not expire prior to April 30, 1971:

NOW, THEREFORE, IT IS AGREED:

\* \* \* \* \*

3. [Paragraph 3 contains the schedule for payments to be made by the employers into the Health, Welfare and Pension Funds to March 1, 1971.]

\* \* \* \* \*

6. Except as herein otherwise provided, this Agreement shall be effective as of the 31st day of May, 1966 and remain in effect until the 1st day of March, 1971 and shall continue from year to year thereafter, unless either the Employer or the Union shall give written notice to the other of a desire to change, amend, modify or terminate the Agreement at least sixty (60) days prior to March 1, 1971, or March 1 of any succeeding year. It is agreed that in the event either party should exercise its rights under this paragraph, the parties will for a period of sixty days prior to March 1, 1971, or any year thereafter, bargain exclusively with each other with respect to the Health and Welfare and Pension Funds referred to in this Agreement.

■■ We agree that the language of the pension agreement is clear on its face and is unambiguous. The determination as to whether a contract is ambiguous is a question of law for the court, and the mere fact that the parties to the contract disagree on the construction does not necessarily establish a case of ambiguity. Metropolitan Paving Co. v. City of Aurora, Colorado, 449 F.2d 177 (10th Cir. 1971). It may well be that Siegrist anticipated that it would be a party to a new master agreement following expiration of the 1966 agreement, and in that event the amount of its payments into the union Health, Welfare and Pension Funds would be predetermined and nonnegotiable until 1971 by virtue of the 1966 Health, Welfare and Pension Agreement. There is, however, no provision in the fringe benefit contract to the effect that the obligation to make the payments provided for therein is contingent upon the existence of a master contract to which Siegrist was a party.

The trial court received evidence as to appellant's contention that the language of the contract did not adequately reflect the intention of the parties and, therefore, the contract should be reformed for mutual mistake. Appellant refers to the testimony of an attorney, Charles A. Grover, an expert in the field of labor law who was present and participated in the negotiations between the parties, as evidence substantiating the theory of mutual mistake. He testified that the contract was never intended to bind a signatory after the expiration of the Master Agreement in 1969 unless such individual became a signatory to a new master agreement, and that the provisions providing for termination in 1971 were merely a covenant as to the amount of benefits payable which would no longer be subject to bargaining upon negotiation of a new master agreement. As to the purpose of the additional two-year period provided for in the fringe benefit contract, this witness said:

"The reason for establishing the amount of fringe benefits payments for two years beyond the expiration of the 1966–1969 master agreement was to insure insurance carriers with whom fringe benefit trusts would be dealing that higher rates in the future would be charged to offset the lower rates in the first year."

The witness further testified in this regard:

"I'm quite sure that the insurance carrier would not have given any contract to the trust that would have provided any benefits of any value if it was on a one-year deal for a nickel an hour contribution. That just wasn't enough to buy anything, so they had to be assured actuarially that there would be enough contributors with enough subsequent increases coming in on ten cents and twenty cents on subsequent years so that while the carrier lost money on the first year it would be able to recoup that loss on the second and third years, based on a three-year contract, without knowing who the contributors were, but having a good idea as to the total estimated number of hours that would be contributed in each of those years."

It is apparent from this testimony that the parties fully understood that to realize the fringe benefits agreed to, it would be necessary for the funds to have contributions from each of the signators of the 1966 Health, Welfare and Pension Agreement for the two additional years at the rates provided for in the contract. This is what the parties agreed to in plain, unmistakeable language and it leaves no room for improvision. We have said that "[i]n the absence of ambiguity the intention of the parties must be ascertained from the language used in the written contract, without resort to parol evidence or extrinsic circumstances." Dipo v. Ringsby Truck Lines, 282 F.2d 126, 130 (10th Cir. 1960); Kohler, Stover & Ivey v. City of Tulsa, 214 F.2d 946 (10th Cir. 1954); Filtrol Corp. v. Loose, 209 F.2d 10 (10th Cir. 1953). See also Metropolitan Paving Co. v. City of Aurora, Colorado, 449 F.2d 177 (10th Cir. 1971); Alexander Dawson, Inc. v. Fling, 155 Colo. 599, 396 P.2d 599 (1964); Gardner v. City of Englewood, 131 Colo. 210, 282 P.2d 1084 (1955).

The appellant also urges that affirmance of the trial court's judgment will result in unjust enrichment in that Siegrist would be required to make a payment into the trust funds even though he has made payments directly to his employees from March 1969 in the same amount as fixed by the agreement. In this regard the trial court appropriately stated:

"We sympathize with Siegrist's concern over the prospect of paying twice, but we do not see how the funds are damaged less because certain employees received windfalls. The union is suing here for breach of contract between itself and defendant. The fund, which is for the benefit of all union employees of contractors who signed the master and pension agreements, has been depleted by Siegrist's failure to perform and the union is seeking simply to compel such performance."

The parties could have agreed that the payments to be made into the funds would terminate if Siegrist was not a party to a new master contract, in which event it is obvious that the necessary insurance would not have been available to provide for the desired health and pension benefits.

Affirmed.